UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RECLAIM THE RECORDS and ALEC FERRETTI, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, <br><br> Defendant. | 23 Civ. 1529 (VEC) |

### REPLY DECLARATION OF REGINA L. BALLARD

Pursuant to 28 U.S.C. § 1746, I, Regina L. Ballard, do hereby make the following declaration under penalty of perjury:

1. I am the Division Chief for the Office of Records Management, Records Review and Release Division within Passport Services, Bureau of Consular Affairs of the United States Department of State (the "Department" or "State"), a position in which I have served since January 2014. I am the Department official charged with the responsibility of overseeing the release of passport records and information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Prior to serving in this capacity, I served as the Team Lead for the Office of Legal Affairs and Law Enforcement Liaison.

2. I am familiar with plaintiff Alec Ferretti's (together with plaintiff Reclaim the Records, "Plaintiffs") FOIA request bearing tracking number F-2019-09405 and subsequently FL-2023-00042, which is the subject of the above-captioned litigation. I make the following statements based upon my personal knowledge, as well as upon information acquired by me in the course of my official duties.

1

3. The core responsibilities of the Office of Records Management include: (1) responding to passport records requests made by the public (under the FOIA and the Privacy Act), by state, local, and federal agencies, by other government agencies, by foreign governments, and those made pursuant to judicial process such as subpoenas, court orders, and discovery requests; (2) reviewing and determining the release of passport records and information; (3) general management of passport records; and (4) the archiving and retrieval of those records.

4. This declaration supplements the declaration I signed in support of the Department's motion for summary judgment filed on January 22, 2024, *see* ECF No. 31, and provides additional details on how the Department maintains Consular Reports of Deaths Abroad ("CRDA") records.

I. **PLAINTIFFS' FOIA REQUEST AND THE DEPARTMENT'S SEARCH**

5. As explained in my prior declaration, Mr. Ferretti's FOIA request sought "a copy of the Index or finding aid to the Reports of Death of a U.S. Citizen Abroad from 1975-present." ECF No. 31-1.

6. Plaintiffs now claim they seek "a document extracting key terms from a series of individual records and organizing those key terms in some logical, relational sequence or table by which each record could be located." *See* ECF No. 42 at 11.

7. However, as I confirmed in my prior declaration and further discussed below, no such index or finding aid exists in any of the locations and systems in which CRDA records are maintained or where such index or finding aid otherwise might reasonably be discovered, including both hardcopy and electronic files. *See* ECF No. 31 ¶¶ 6, 10-19.

8. In fact, the Department searched for *any* index or list that could serve as a finding aid for CRDAs, including as now defined by Plaintiffs, without any restriction as to the date of such an index or list.

9. I considered whether any index or finding aid exists for either paper or electronic CRDAs. Based on my experience as the Division Chief for Office of Records Management, Records Review and Release Division within Passport Services, Bureau of Consular Affairs of the Department, I have familiarity with how the Department maintains CRDAs and would have known of the existence of any index or finding aid that was created for them.

10. In my role, I routinely work in the Passport Information Electronic Records System ("PIERS"), which is used to retrieve the Department's CRDAs that exist electronically, and have intimate knowledge of its purpose and workings. I am also familiar with the Department's process for storing records at the Washington National Records Center (the "Records Center") of the U.S. National Archives and Records Administration ("NARA"). Because the Department centrally retrieves electronic CRDAs from one location, *i.e.*, PIERS, there is no other electronic recordkeeping system on which a search for the requested index or "finding aid" might reasonably result in discovery of the requested index or "finding aid," or on which it would have been practical to run a search query for "CRDA index" or "CRDA list," for example. I am also aware of no effort having ever been undertaken by a Department employee to create an index or "finding aid" for paper CRDAs stored at the Records Center. There is no index or finding aid that exists for those records, and I am not aware of any index or finding aid having ever existed for such records aside from any index that may have existed in the now defunct Passport File Miniaturization ("PFM") database, as discussed in my prior declaration. *See* ECF No. 31 ¶¶ 12-13.

11.     As explained in my prior declaration and further discussed below, no such index or "finding aid" would have been necessary in the course of the Department's daily work to locate and retrieve a CRDA, and as a practical matter none could have been generated in any event by a PIERS system user.

12.     Nonetheless, I also conducted a search for any such index or "finding aid" by speaking with Department personnel with subject matter expertise, including Passport Services, which is part of the Office of Modernization and Systems Liaison, to determine whether an otherwise unknown index or finding aid for CRDAs may exist.  These Department personnel confirmed that the Department does not maintain, and has never maintained, any index or "finding aid" for CRDAs beyond that which might have existed in the defunct PFM database.

13.     I also inquired with knowledgeable personnel in the Department's Office of Consular Systems and Technology ("CST") to determine whether any index or "finding aid" for CRDAs might exist in PIERS, and they confirmed that no such index or "finding aid" resides in PIERS. They also confirmed that no feature in PIERS allows a user to pull an index or "finding aid" for CRDAs PIERS retrieves, and PIERS has never provided such functionality to system users.

14.     For the foregoing reasons and as explained in my prior declaration, any further search for an index or "finding aid" that is used by the Department to locate CRDAs would be futile.

15.     Finally, as discussed below, I also inquired with CST to determine whether any index or "finding aid" could nonetheless be extracted from Department systems or databases, and I confirmed that there is no "backend" from which the Department can feasibly extract the entire data set of CRDAs from PIERS.  Furthermore, any endeavor to create an index of the

Department's CRDAs—in addition to being unnecessary for the Department's work involving CRDAs—would be exceedingly burdensome.

## II.   THE DEPARTMENT'S MAINTENANCE OF CRDAS

16.   As explained in my prior declaration, the Department maintains CRDAs in both electronic and paper form.  *See* ECF No. 31 ¶¶ 8-10, 14-16.  These paper records, which number at least 331,000, are stored at the Washington National Records Center (the "Records Center") of the U.S. National Archives and Records Administration ("NARA") in Suitland, Maryland. The boxes are generally organized by the date they are digitized and the unique identifier or batch number assigned to the group of archival materials they belong to that have been transferred to NARA, while the records within the boxes are organized in alphabetical order by last name for each year.

17.   The Department also maintains CRDAs in electronic format, and they number at least in the hundreds of thousands since most of the paper CRDAs have been digitized.  All Department CRDAs that exist in electronic form—whether as a result of having been originally received by the Department in electronic form or having been digitized from an originally paper source—can be retrieved from PIERS.  To search for any CRDA, a Department employee would start by inputting into PIERS an individual's personal identifiable information ("PII")—such as name, date of birth, Social Security Number, place of birth, date of death, or place of death—to retrieve information up to a certain number of results beyond which no further results are shown even if they fit the criterion used.  There is no feature in PIERS that allows a user to pull an index or "finding aid" of CRDAs PIERS retrieves.

18.   If the PII provided is associated with any person who has electronic records, the Department employee would be able to see the entry in PIERS and any data that has been

5

entered for that person. However, CRDA data, all of which had been entered manually, remains unverified; prior to relying on or using that data, the employee must verify it against any actual corresponding electronic record seen in PIERS or any corresponding paper record and correct any errors.[1]

19. If the PII provided is associated with any person who only has paper records or whose electronic records are deficient (*e.g.*, illegible), the Department employee would need to coordinate with the Records Center to manually search boxes stored there to locate the relevant paper records using any available information in PIERS.

20. Notably, PIERS does not offer the capability to search by date range. As I described in my prior declaration, PIERS is a tool that allows Department employees to answer file questions relating to passport records. *See* ECF No. 31 ¶ 14. Because PIERS was designed to provide concrete answers to concrete inquiries, Department employees would always have some PII regarding the subject of the request to use in their searches, so a function to search by date range would not have been necessary in the ordinary course of its use. Having the PII as part of the search criteria would also reduce the likelihood that the results returned from the search would be incomplete. This inability in PIERS to search by date range applies to all users of PIERS and is not a functionality that can be enabled for users with broader access permissions.

21. To clarify, when I used the term "backend" in my prior declaration, I was referring to the Department's support team, which falls under CST. *See* ECF No. 31, ¶¶ 17-18. When I used the term "frontend," I was referring to all other Department system users, including myself. *Id.* ¶ 18.

---

[1] Given the volume of records that exist—a number that increases daily—the Department has generally only corrected any data as needed.

22. As I indicated in my prior declaration, what is accessible via the "backend" is different from the "frontend" in only a few material respects. The "backend" has the ability to search within PIERS using criteria that are additional to the ones available to the "front end" for one. There is also no numerical cap to the number of results returned to the "backend." However, the results are only reference numbers to be used in PIERS, which is to say the results contain no information about the record(s) being requested that could be used to generate something that could serve as an index or finding aid for all the CRDAs. The capabilities offered are otherwise the same capabilities to which a system user already has access in the normal course of business.

23. Thus, for instance, if there are a thousand people born on a specific date of birth entered into PIERS, only the first two hundred and fifty entries at most would be returned to a "frontend" user. For a "frontend" user to be able to see the one thousand entries, they would have to run additional searches using the specific date of birth plus other PII criteria to return up to an additional two hundred and fifty results until all one thousand entries have been returned through all the searches combined.

24. On the other hand, a "backend" user could search using that specific date of birth and return one thousand reference numbers. However, because that process only generates reference numbers, a "frontend" user would still have to search each of those reference numbers individually in PIERS for the corresponding records.

### III.   BURDEN REQUIRED TO GENERATE AN INDEX OR FINDING AID FOR ALL CRDAS

25. The Department's CRDAs from 1975 and earlier generally exist only in paper format. As explained in my prior declaration and further discussed below, in the absence of an existing index or finding aid for all the CRDAs, the only way to generate something that the

Department could use as an index or finding aid for available CRDAs is to extract data retrievable in PIERS itself in addition to any additional data from paper records stored at the Records Center, and then subject the results to extensive data verification.

26.    As I have explained in my prior declaration, generating an index or finding aid for over 331,000 CRDAs on which the Department could rely to locate and retrieve CRDAs would be a monumental undertaking requiring a minimum of thousands of manhours, which would necessarily pull relevant Department employees away from their regular duties—including responding to FOIA requests submitted by persons seeking their own passport records—at a time when they are already short-staffed and thinly stretched. *See* ECF No. 31 ¶ 20. Due to the Department's technological limitations, multiple steps are required to generate such an index or finding aid. *Id*. The Department's support team would have to conduct a search for every individual date from 1975 to 2019 (*i.e.*, January 1, 1975, January 2, 1975, and so on)[2] and then provide the entire collection of reference numbers to PIERS systems users, who would then search those reference numbers on an individual basis in PIERS. *Id*. For each entry, they would then have to verify the information in PIERS and correct any information by comparing any entered data with any actual record stored in PIERS. *Id*. Finally, they would have to manually generate an index from the corrected information. *Id*. This the only way in which a reliable list could be generated that could conceivably be used by the Department as an index or "finding aid" for CRDAs.

---

[2] This is because, as confirmed by test searches I had conducted, the maximum number of results that PIERS would return to a frontend user is 250. In other words, a frontend user would not likely be able to retrieve the full set of CRDA data, even searching date-by-date, since it is expected that the actual number of CRDA results would exceed 250 on some days within the requested date range.

27.     The absence of an index or finding aid in PIERS is not contrary to the statements made in the Privacy Impact Assessment ("PIA") regarding the Department's external sharing of PIERS information. *See* ECF No. 37-6 at 8. That the Department can share PIERS data externally within the Executive Branch, be it with the Department of Homeland Security ("DHS") or the U.S. Census Bureau ("Census"), does not signify or require the existence of an index or finding aid in PIERS for CRDAs.

28.     As the PIA very specifically states, the Department shares PIERS data "indirectly" with DHS by giving DHS access to the Consular Consolidated Database, which pulls information from PIERS. This indirect sharing of data allows DHS to obtain the same data that is in PIERS through an indirect application that does not include any sort of index or table of the data included in the extraction. The Department shared information in PIERS with Census through a bulk data dump that necessarily did not include any sort of index or table of the dumped data.

29.     In other words, the data transferred to DHS and Census were subject to the same limitations as the data that currently exists in PIERS.  Because there is no functionality within PIERS to export individual fields for each record, at a minimum, the Department would still have to verify all the information as part of the processing of the transferred data before manually generating a list reliable enough for use by the Department as an index or "finding aid" for CRDAs, whereas DHS and the Census could have done so for themselves as necessary.  This verification effort would be required for hundreds of thousands of records, each with eight data fields and a potential need for manual searches at the Records Center, and thus very burdensome.

## IV.   CONCLUSION

30.   In conclusion, the Department, relying on the subject matter expertise of relevant employees, including myself, confirmed that at no such point have Department employees used an "index" or "finding aid" to identify or otherwise locate a CRDA for the period 1975 to 2019, and that the Department does not maintain and has never maintained such an index of finding aid.  Nevertheless, the Department conducted a search in locations where such an index or finding aid might reasonably be discovered if such an index or finding aid ever existed at the Department.  The Department confirmed that it had no record that would be responsive to the FOIA request, as it stated in its letter to Plaintiffs on April 24, 2023.  *See* ECF No. 31-2.

Executed by me on June 26, 2024, Washington, D.C.

_____
Regina L. Ballard